AO-106 (Rev. 06/09)-Application for Search Warrant

# UNITED STATES DISTRICT COURT

### for the

### Northern District of Oklahoma

FILED

NOV 1 4 2022

Mark C. McCartt, Clerk
U.S. DISTRICT COURT

| | | |
|---|---|---|
| In the Matter of the Search of | ) | Case No. 22-mj-754-CDL |
| *10869 East 33rd Place, Tulsa, Oklahoma* | ) | |
| *and curtilage premises* | ) | **FILED UNDER SEAL** |
| | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

### See Attachment "A"

located in the __Northern__ District of __Oklahoma__, there is now concealed *(identify the person or describe the property to be seized)*:

### See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **21 U.S.C. §§ 846 and 841(a)** | **Conspiracy to Distribute and Conspiracy to Possess with Intent to Distribute Cocaine** |

The application is based on these facts:

**See Affidavit of SA Nicholas Sanders, DEA attached hereto.**

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Special Agent Nicholas Sanders, DEA**
*Printed name and title*

Sworn to before me via telephone.

Date: __November 10, 2022__

_____
*Judge's signature*

City and state:  __Tulsa, Oklahoma__

**Christine D. Little, U.S. Magistrate Judge**
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| In the Matter of the Search of 10869 East 33rd Place, Tulsa, Oklahoma | Case No. _____ <br><br> **FILED UNDER SEAL** |

**Affidavit in Support of an Application Under Rule 41
for a Warrant to Search and Seize**

Nicholas Sanders, being duly sworn under oath, states as follows:

**Introduction and Agent Background**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search **10869 East 33rd Place, Tulsa, Oklahoma**, Tulsa County, Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises, as further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Drug Enforcement Administration (DEA), United States Department of Justice. I have been a DEA Special Agent since May 2021. I am currently assigned to the Tulsa Resident Office (TRO), in Tulsa, Oklahoma, and I am an "investigative or law enforcement officer" of the United States as defined in 21 U.S.C. § 878(a). I am a federal law enforcement officer as defined under Rule 41(a)(2)(C) and am authorized to request this search warrant because I am a government agent who is engaged in enforcing federal criminal laws and I am within

the category of officers authorized by the Attorney General to request such a warrant. I was previously employed with the Jefferson City, Missouri Police Department, Olathe, Kansas Police Department and most recently the Kansas City, Kansas Police Department. In total, I have approximately 11 years of law enforcement experience. During my law enforcement career, I have received countless hours in specialized training from both local and federal law enforcement agencies.

3.     This training has focused upon methods of unlawful manufacturing of illegal narcotics via clandestine laboratories, the installation and monitoring of global positioning satellite (GPS) trackers, Title III wire interceptions, smuggling and distribution techniques, methods of drug trafficking, as well as the means by which drug traffickers derive, launder and conceal their profits from drug trafficking, the use of assets to facilitate unlawful drug trafficking activity and the law permitting the forfeiture to the United States of assets purchased with drug proceeds or assets used or intended to be used to facilitate the drug violations. I have gained a considerable amount of knowledge about drug trafficking organizations and their members through my training and experience.

4.     Based on my experience as a Special Agent with the DEA, I know that those involved in international drug trafficking rely heavily on telephones to communicate with one another in order to coordinate the smuggling, transportation, and distribution of illegal drugs, and that they frequently employ coded language and

2

slang terminology in an effort to maintain secrecy while engaging in such communications.

5.     Through my employment as a Special Agent with the DEA, I have gained knowledge in the use of various investigative techniques, including the use of wire and electronic interceptions and other types of electronic surveillance, physical surveillance, undercover investigators, confidential informants, cooperating witnesses, controlled purchases of illegal drugs, consensually-monitored recordings, investigative interviews, trash searches, mail covers, financial investigations, administrative and grand jury subpoenas, and search and arrest warrants.

6.     The information contained in this affidavit is known personally by me and/or was learned by me from other officers or agents, witness interviews or by reviewing reports and documents. Since this affidavit is being submitted for the limited purpose of enabling a judicial determination of whether probable cause exists to justify the issuance of a search warrant for the described premises, I have not included each and every fact known to me and others regarding the investigation of this matter. I have set forth only the facts that I believe are necessary to establish probable cause. I base my belief that financial and documentary evidence related to the transportation, sale and/or distribution of illegal controlled substances will be recovered based on the information contained within this affidavit.

7.     Based on my training, experience, and the facts set forth in this affidavit, there is probable cause to believe that evidence of violations of Title 21, United States Code, Sections 846 and 841(a) – Conspiracy to Distribute and Conspiracy to Possess with Intent to Distribute Cocaine, will be located at **10869 East 33rd Place, Tulsa, Oklahoma**, Tulsa County, Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises as further described in Attachment A.

### Jurisdiction

8.     "[A] warrant may be issued to search for and seize any property that constitutes evidence of a criminal offense in violation of the laws of the United States." 18 U.S.C. § 3103a.

9.     The requested search is related to the following violations of federal law:

    a.   21 U.S.C. §§ 846 and 841(a) – Conspiracy to Distribute and Conspiracy to Possess with Intent to Distribute Cocaine

10.    Venue is proper because the person or property described in this affidavit is located within the Northern District of Oklahoma. Fed. R. Crim. P. 41(b)(1).

### Drug Offenses Background

11.    During the course of my training and interviews with various defendants I have learned how individuals involved in drug distribution schemes maintain records and conspire to deceive law enforcement as well as rival distributors of controlled dangerous substances. I have learned how individuals who are involved in the

4

distribution of controlled dangerous substances maintain records and secret monies derived from the sale of illegal drugs.

12.     Based on my background, training and experience, as previously detailed in this affidavit, I know:

a.     Drug traffickers often place assets in names other than their own to avoid detection of these assets by law enforcement. In addition, drug traffickers often use a variety of vehicles, vehicles in the names of others and rental vehicles to prevent detection and identification by law enforcement and to prevent forfeiture of the vehicles;

b.     Even though these assets are in the names of other people, the drug traffickers continue to use these assets and exercise dominion and control over them;

c.     Drug traffickers must maintain a large amount of U.S. currency in order to finance their ongoing drug activities;

d.     Drug traffickers maintain books, computer data and programs, records, receipts, notes, ledgers, airline tickets, money orders, cashier's checks, records of wire transfers, records of purchase of vehicles and property and other papers relating to the importation, ordering, sale, transportation, possession, purchase and transfer of controlled substances;

e.     Drug traffickers often keep records that are usually recorded in units of weight and monetary value, associated with pounds and kilograms or other such units of measurement and dollar amounts to assist them in their business, records to keep track of amounts "fronted" to customers and money owed by customers for amounts "fronted" by the trafficker; the aforementioned records, books, notes, ledgers, etc., are maintained where drug traffickers have ready access to them, i.e., on their persons, in their vehicles,  in or about their residences and places of business. These documents are often kept in code to secret their meaning from law enforcement;

f.     It is common for drug traffickers to hide contraband, proceeds of drug sales, financial instruments, precious metals, jewelry and other items of value, and/or proceeds of drug transactions, records and evidence of drug transactions relating to transferring, hiding or spending large sums of money made from engaging in drug trafficking in secure locations on their persons, within their vehicles, within or around

their residences and businesses for ready access or to conceal them from law enforcement authorities;

g.     When drug traffickers collect proceeds from the sale of drugs, they attempt to legitimize these profits. To accomplish these goals, drug traffickers utilize some, if not all, of the following means; foreign and domestic banks and their attendant services, securities, cashier's checks, money orders, bank drafts, letters of credit, real estate, shell corporations and business frauds;

h.     Drug traffickers commonly maintain names, addresses and telephone numbers in books or papers for their associates in the trafficking organization. These books or papers include such items as address books, telephone messages, etc. Shorthand and/or code names are sometimes used for buyers, co-conspirators, sellers, weights and other details of the drug traffickers;

i.     Drug traffickers hide and maintain in their residences, storage buildings, barns and outbuildings, places of business, family member's residences and the residences of co-conspirators, financial records which, when analyzed, will show their accumulation and expenditure of money and assets substantially exceeds any legitimate income. I am aware that the courts have recognized that unexplained wealth is derived from crimes motivated by greed, in particular, drug trafficking;

j.     The aforementioned books, records, receipts, notes, ledgers and other items mentioned above, are commonly maintained where the drug traffickers have ready access to them and are maintained for long periods of time after the actual event reflected in the documents;

k.     Drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their products. These traffickers usually maintain these photographs in their possession, as in their cellular telephones, iPads, or other portable electronic devices;

l.     Drug traffickers usually keep paraphernalia for packaging, cutting, weighing, and distributing drugs. This paraphernalia includes, but is not limited to, scales, plastic bags, cutting agents, and other devices used for packaging to aid in the concealment of the drug for its distribution;

m.     Drug traffickers often keep handguns, ammunition and other weapons in their residences (including outbuildings), businesses and automobiles to safeguard supplies of drugs and the proceeds of drug sales;

6

n.      Drug traffickers often operate under assumed names in order to conceal their true identities from law enforcement and, in so doing, acquire property, services and personal identification (such as driver's licenses and birth certificates) under their assumed or alias names, and they maintain such documents in evidence of their false identities in their residences (including outbuildings), businesses and automobiles together with evidence of their true identities;

o.      Drug traffickers commonly conduct a significant amount of their business by using cellular telephones and other telephone systems and normally make frequent calls to conduct, direct, supervise and coordinate their activities;

p.      Drug traffickers commonly keep their stash of controlled substances and currency proceeds separate and store the same in multiple residences (including outbuildings), businesses and automobiles; and

q.      Individuals involved in illegal activities like drug trafficking often generate large amounts of cash from their illegal activities. In order to conceal profits from illegal activities, these individuals employ various types of financial transactions to disguise and conceal profits. Individuals involved in criminal activities may utilize the facade of a legal enterprise that can be represented as the source of funds arising out of the criminal activity. Individuals involved in illegal activity often physically conceal their funds in locations such as residences, safe deposit boxes, safes or other locations where assets can be physically concealed. Illegal proceeds or assets may also be hidden by placing the assets in third party names including personal property, real property or financial institutions.

13.     Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including, but not limited to, hard disk drives, floppy disks, thumb drives, compact disks, magnetic tapes, memory chips, cellular telephones, iPads and other portable electronic devices. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including

7

the following:

a.     Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b.     Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c.     The aforementioned facts most commonly necessitate the seizure of computers, cellular telephones, iPads and other portable electronic devices and all related computer equipment in order to conduct a search by Forensic Examiners in the well-equipped and controlled environment of a laboratory setting. If any electronic storage device is seized during the search of the premises described in Attachment A, a separate warrant will be sought before searching those storage devices for data.

## Investigative Summary

14.     In approximately January 2020, members of the DEA Tulsa Resident Office (TRO), the Tulsa Police Department (TPD), and the DEA Oklahoma City District Office (OCDO) began investigating a DTO distributing cocaine and methamphetamine in Tulsa, Oklahoma, and other parts of the United States.

15.     On June 24, 2022, United States District Judge Claire V. Eagan,

Northern District of Oklahoma, signed an affidavit and order authorizing investigators to intercept wire and electronic communications over telephone number 918-693-0190 ("Target Telephone #1"). During this investigation, investigators have identified telephone number 918-693-0190 to be used by Christian Ramirez. On this same date, U.S. Cellular complied with the court order and investigators began intercepting wire and electronic communications over Target Telephone #1.

16.　　On July 22, 2022, United States District Judge Claire V. Eagan, Northern District of Oklahoma, authorized the continued interception of wire and electronic communications over Target Telephone #1, used by Christian Ramirez.

17.　　On August 19, 2022, United States District Judge Claire V. Eagan, Northern District of Oklahoma, authorized the continued interception of wire and electronic communications over Target Telephone #1, used by Christian Ramirez. This interception terminated on September 17, 2022.

18.　　On October 24, 2022, United States District Judge Claire V. Eagan, Northern District of Oklahoma, authorized the initial interception of wire communications over telephone number 918-691-4931 ("Target Telephone #4") and 720-431-5722 ("Target Telephone #5"). During this investigation, investigators have identified Jose Luis Reyes Alvarez to use both phones. Agents deactivated interception of Target Telephone #4 as it was inactive due to non-payment of the bill. The interception of Target Telephone #5 is scheduled to terminate on November 23, 2022.

## Probable Cause

19.     During this investigation, investigators have identified Jose Luis Reyes Alvarez to be an associate of Christian Ramirez. Investigators have also identified Reyes to use telephone numbers 918-691-4931, as well as 720-431-5722, and to reside at **10869 East 33rd Place, Tulsa, Oklahoma**, which is located within the Northern District of Oklahoma. Moreover, investigators have identified Reyes to operate a black Dodge Ram Truck bearing Oklahoma tag LFZ782 and black Kia Optima bearing Oklahoma tag LFN855. Both of the vehicles are registered to Nadia J. Revilla at 1545 North Norwood Avenue, Tulsa, Oklahoma. Furthermore, investigators have identified Reyes to identify himself as the cousin of Mexico-based cocaine source of supply (SOS) Jesus Omar Morales Delgado ("Delgado," a/k/a "Rayo").

**July 27, 2022**

20.     On July 27, 2022, at approximately 11:27 a.m., Christian Ramirez, using Target Telephone #1, called Delgado, at Mexico-based telephone number 52-614-539-1314. During this call, Christian Ramirez said, "Uh, I will send you that as soon as I finish here. It's just that I turned off the other phone last night." Delgado said, "That's all, that's all." Christian Ramirez said, "But that *miltia* is there." Delgado said, "Oh, okay. That's fine. That's fine. Just tell me before, because I have to take off somewhere, so I don't know at what time..." Christian Ramirez asked, "Okay, yeah. How do you want me to send it? By Western union, by Banorte or how? How do you want it?"

Delgado replied, "Oh, if you can, by…Is it possibly by, I mean, directly to a card or to a name?" Christian Ramirez said, "I didn't even check it, that you sent it to me to the other phone. I will check it now. But it was a transfer to the bank or how did it go? The truth is I never checked that." Delgado said, "Well, no, no, there at Walgreens, through Western Union." Christian Ramirez said, "So then, now that I will be arriving here. Send it to me to this phone. Now that I will go by or if not, through Abarrotes Perez. I will send it now." Delgado said, "Alright. All set. Yes, before I have to leave out of town. Before I leave so I can collect it here." Christian Ramirez said, "Okay. Yes, give me about one hour, more or less. I will send it soon. Alright, then. Bye, bye. Yes, yes, for this one, and then the same…Let me see, because I might be needing another two. I'm just waiting for the guys to bring me the money first. But I will let you know about that as well." Delgado said, "Alright."

21.    Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Delgado was requesting for Christian Ramirez to wire him drug proceeds. Delgado advised Christian Ramirez that he would be leaving town soon and would like to receive the drug proceeds before he left town. Christian Ramirez agreed to send Delgado the drug proceeds in approximately one hour. Additionally, Christian Ramirez advised Delgado that he might need two more kilograms of cocaine. However, Christian Ramirez explained

that he was currently waiting for customers ("the guys") to pay him for the kilograms of cocaine that Delgado had already supplied to Christian Ramirez.

22.     At approximately 2:04 p.m., Christian Ramirez, on Target Telephone #1, called Delgado, at Mexico-based telephone number 52-614-539-1314. During this call, Christian Ramirez advised, "Dude! I'm here trying to send the money, but these assholes here are saying that of lately, for the last two days, they have been stopping the money transfers to Chihuahua, Chihuahua." Delgado replied, "That's fucked up." Christian Ramirez explained, "Yeah, that of lately, dude, more or less, they have been stopping the transfers. Because just now, there's a long line here of all this people who want their money back." Delgado said, "Uh-huh." Christian Ramirez asked, "In some other way, some other bank acc...I'm here out on the street. To a bank account or somebody who I can give it to or something." Delgado said, "To a bank account, but it's a Mexican one. Oh, could it be done to Delicias? To Delicias, Chihuahua?" Christian Ramirez said, "Holy shit! What other...? I don't know. The woman told me that they are stopping all transfers to Chihuahua. Uh-huh. She says they're stopping all transfers since yesterday. All of the people want their money back and are fighting to get their money back." Delgado said, "Son of a bitch. I'm saying that at Walgreens, they don't ask you for anything there at the machine." Christian Ramirez stated, "Yes, I'm at Perez, but I was going to send it through Western Union anyway." Delgado said, "Or from Wal-Mart to Wal-Mart." Christian Ramirez said, "From Wal-Mart to

Wal-Mart it can be done. But, sent to me from Wal-Mart to Wal-Mart...but to where?" Delgado advised, "To same, to Chihuahua or to Delicias, Chihuahua." Christian Ramirez said, "To Delicias, Chihuahua. Or to Chihuahua, Chihuahua. I will do this right away." Delgado said, "All set, there at Wal-Mart. Now you just let me know."

23.   Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Christian Ramirez called Delgado to advise him that he was unable to send Delgado the drug proceeds via wire transfer with Western Union due to all transfers to Delicias, Chihuahua, Mexico, being blocked at that time. Delgado then requested Christian Ramirez to send him the drug proceeds via wire transfer from Wal-Mart to Wal-Mart.

24.   At approximately 2:48 p.m., Christian Ramirez, on Target Telephone #1, called Delgado, at Mexico-based telephone number 52-614-539-1314. During this call, Christian Ramirez advised, "They are not sending this money to Mexico here at Wal-Mart as well." Delgado said, "Oh, shit!" Christian Ramirez asked, "What could have happened?" Delgado said, "To, to which accounts can you deposit to, Mexican ones?" Christian Ramirez replied, "The problem is that I have never deposited money to Mexican accounts. I always deposited here, like in the America or the other one, the Oklahoma." Delgado said, "Oh. Uh, so then they told you, you couldn't, that you couldn't do it to Chihuahua?" Christian Ramirez explained, "The woman just told me, when I said 'I want to send this money to Mexico, to Chihuahua,' she said, 'To

13

Mexico, right now we are not sending anything.' Did something happen there during the last few days or something?" Delgado stated, "No, nothing." Christian Ramirez continued, "Huh…Because they said at the Perez Abarrotes as well, that they were not advising it to Mexico, because everything that was sent, nobody was receiving it. Now, they just wanted their money to be returned. But here in town, isn't there someone?" Delgado said, "Oh, shit…" Christian Ramirez asked, "And the countrymen having to do with yesterday's thing, don't you send the money to them?" Delgado replied, "No, I have no one over there right now. They are in…But they are there in Oklahoma, and it is my belief they came down already." Christian Ramirez advised, "If you can, please wait for me. Because I most probably will grab another two in a little while later, like tomorrow. That way it would go up to 3,000 pesos." Delgado said, "Yes. Yes, yes." Christian Ramirez said, "I just have to make sure that for that one, just the same, I could give them the money. I mean, you do trust them enough for me to give the money to them and they don't fuck it up or what?" Delgado said, "Oh, yes, precisely because of that. You could say it yourself…" Christian Ramirez said, "Yes, yes, yes, of course. But, don't you have a family member here or somebody?" Delgado said, "No. Well, let me call my cousin to see if he's over there. Because he was in Minnesota." Christian Ramirez advised, "Okay. Yes, yes, call him. And to whether I could give the money to him or if you are able to hold this until tomorrow…In other words, I believe I will need those two other squares. I'm just

14

waiting for them to bring me the money. I will just confirm it quickly, and if it's all the same, for them to take the 3,000 pesos." Delgado said, "Uh-huh. Okay. It's all set. Let me…" Christian Ramirez said, "Okay. That's fine. Call him. In the case that he's around here, I will give him the 1,000 pesos."

25.     Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Christian Ramirez advised Delgado that the wire transfer at Wal-Mart was also denied. Christian Ramirez and Delgado then discussed an individual in the United States or Tulsa to pick-up the money. Christian Ramirez asked if the individual that delivered him kilogram quantities of cocaine the day previously (July 26, 2022) at Delgado's direction could pick-up the money from Christian Ramirez. Subsequently, Delgado advised Christian Ramirez that he would contact his cousin, later identified as Jose Luis Reyes Alvarez ("Reyes"), to see if he had returned to Tulsa from Minnesota. Christian Ramirez went on to advise Delgado that he believes he will need two more kilograms of cocaine ("need those two other squares").

26.     At approximately 4:34 p.m., Christian Ramirez, on Target Telephone #1, received a call from Reyes, at Target Telephone #4. During this call, Reyes said, "No, no. Just to find out where can I see you." Christian Ramirez said, "Uh, could I send you the address for the house and you come over here?" Reyes said, "Alright, alright."

27.     Based on my training and experience and my knowledge of this investigation, I believe Reyes is the cousin of Delgado. I believe Reyes called Christian Ramirez, at Delgado's direction, in order for Reyes to receive the drug proceeds from Christian Ramirez.

28.     At approximately 4:34 p.m., Christian Ramirez, on Target Telephone #1, called Delgado, at Mexico-based telephone number 52-614-539-1314. During this call, Christian Ramirez asked, "So, this guy is to be trusted, right?" Delgado replied, "Yes, he's my cousin."

29.     Based on my training and experience and my knowledge of this investigation, I believe Christian Ramirez called Delgado in order to verify that Reyes could be trusted to travel to Christian Ramirez's residence in Tulsa, Oklahoma, in order for Reyes to pick up the drug proceeds. Delgado vouched for Reyes and advised Christian Ramirez that Reyes was his cousin and could be trusted.

30.     At approximately 4:58 p.m., Christian Ramirez, on Target Telephone #1, received a call from Reyes, at Target Telephone #4. During this call, Reyes made a statement that was unclear to Spanish-speaking monitors that were interpreting this call. Christian Ramirez said, "I'm coming outside now. Bet."

31.     Based on my training and experience and my knowledge of this investigation, in the call described above, I believe Reyes called Ramirez in order to

advise him (Ramirez) that he (Reyes) had arrived to Ramirez's residence. Ramirez then advised Reyes that he was coming outside to meet with Reyes.

32.     At approximately 5:00 p.m., investigators observed a black Dodge Ram truck arrive to Ramirez's residence, located at 236 South 120th East Avenue, Tulsa, Oklahoma. A short time later, investigators observed the black Dodge Ram truck depart from Ramirez's residence. Investigators followed the black Dodge Ram truck and observed the vehicle to bear Oklahoma tag LFZ782.

33.     On July 28, 2022, an Intelligence Analyst (IA) assigned to the DEA TRO conducted an open source database search of Nadia Revilla. The IA observed Revilla to be associated with a residence, located at **10869 East 33rd Place, Tulsa, Oklahoma**. On this same date, at approximately 4:23 p.m., your affiant established physical surveillance at the residence, located at 10869 East 33rd Place. Upon arrival, your affiant observed the same black Dodge Ram truck used to collect drug proceeds backed into the driveway. Additionally, your affiant observed a black Kia Optima bearing Oklahoma tag LFN855 parked in the driveway. The black Kia Optima is registered to Nadia Revilla at 1545 North Norwood Avenue, Tulsa, Oklahoma.

34.     On August 3, 2022, United States Magistrate Judge Christine D. Little, Northern District of Oklahoma signed an affidavit and order authorizing investigators to install a GPS tracking device on the Dodge Ram bearing Oklahoma tag LFZ782, which is registered to Nadia Revilla at 1545 North Norwood Avenue, Tulsa,

Oklahoma. Investigators have used GPS location data on this vehicle in order to assist with conducting physical surveillance in attempt to establish Reyes modus operandi. This tracking device was authorized to be used until September 2, 2022. On September 23, 2022, United States Magistrate Judge Christine D. Little, Northern District of Oklahoma signed an affidavit and order authorizing investigators to install a GPS Tracking device on the Dodge Ram bearing Oklahoma tag LFZ782. This tracking device was authorized to be used until October 23, 2022. On October 21, 2022, United States Magistrate Judge Susan Huntsman, Northern District of Oklahoma signed an affidavit and order authorizing investigators to continue monitoring the GPS tracking device on the Dodge Ram bearing Oklahoma tag LFZ782. This order is authorized to be used until November 30, 2022.

35.    On August 31, 2022, at approximately 8:28 a.m., Ramirez, on Target Telephone #1, called Delgado at Mexico-based telephone number 52-614-539-1314. During this call, Ramirez and Delgado greeted. Ramirez told Delgado he wanted to let Delgado know Ramirez was going to leave the money with his guy. Delgado said perfect and that Delgado would call and tell them to leave right away. Ramirez said okay and asked Delgado if it would be the same. Delgado said he was calculating and then said 47. Ramirez asked if 47. Delgado said yes. Ramirez said okay and the 3 bucks he would leave it to see what they would do with it. Delgado said yes and the other 3 would need to be given to his cousin and that Delgado would call him to U/I.

Ramirez said okay and for Delgado to holler at Ramirez when the guys were ready to send him.

36.     Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Ramirez called Delgado to tell him that he would be delivering the drug proceeds to Francisco Javier Sarmiento ("his guy"). Delgado said he could contact the couriers ("them"), that would be delivering Ramirez and Sarmiento cocaine, and tell them to leave immediately for Tulsa. Delgado directed Ramirez to give the couriers $47,000 ("47") U.S. currency. Ramirez and Delgado agreed for Ramirez to give the remaining $3,000 ("3") U.S. currency to Delgado's cousin, Jose Reyes Alvarez. I believe Ramirez and Sarmiento would be receiving two kilograms of cocaine in exchange for $50,000 ($25,000 per kilogram of cocaine) from Delgado's couriers.

37.     At approximately 3:35 p.m., Ramirez, on Target Telephone #1 received a call from Delgado, at Mexico-based telephone number 52-614-539-1314. During this call, Delgado asked Ramirez for the address, because he no longer had it, as he had erased it. Ramirez told Delgado that he was going to check with the guy to see where he wanted to meet them because he thought he wanted to meet them at another location, like on 15th and Sheridan. Ramirez said he would call the guy really quick. Delgado said that they had confirmed to him that they would be at the point at 5:30. Ramirez said okay, that is fine. Delgado said okay.

19

38.     Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Delgado called Ramirez to direct Ramirez to send him the address of where Sarmiento would like to meet the couriers. Ramirez advised Delgado he would ask Sarmiento the location of where he would like to meet. Additionally, Delgado advised Ramirez that the couriers would arrive to Tulsa ("the point") at approximately 5:30 p.m.

39.     At approximately 3:36 p.m., Ramirez, on Target Telephone #1, called Sarmiento, at telephone number 918-406-7478. During this call, Ramirez told Sarmiento, 5:30. Sarmiento said okay. Ramirez told Sarmiento to swing by the house at 5:00. Ramirez said he believed that it was going to be at the same place as the other time. Sarmiento said okay, that at 5:00 he would meet him there. Ramirez said okay.

40.     Based on my training and experience and my knowledge of this investigation, during the call described above, Ramirez directed Sarmiento to arrive to his (Ramirez's) residence at 5:00 p.m. because the couriers would be arriving at approximately 5:30 p.m.

41.     At approximately 4:50 p.m., investigators observed Sarmiento depart from his residence, located at 7136 East 13th Street, Tulsa, Oklahoma, driving his maroon Chevrolet Suburban bearing Oklahoma tag LFS137. Investigators observed Sarmiento arrive to Ramirez's residence, located at 236 South 120th East Avenue, at approximately 5:03 p.m. Upon Sarmiento's arrival, investigators observed Sarmiento

exit his vehicle carrying a box under his arm. Sarmiento proceeded to enter into Ramirez's open garage door.

42.    At approximately 5:40 p.m., Ramirez, on Target Telephone #1, called Delgado at Mexico-based telephone number 52-614-539-1314. During this call, Delgado said that the guys would be there in exactly 35 minutes. Ramirez asked Delgado if everything was good and if they had not gotten held up for anything else. Delgado said everything was good. Delgado said they were in a black Ram Dually. Ramirez told Delgado to tell the guy to park, and they were close. Delagdo said okay. Ramirez asked what the color was. Delgado said black Ram of double...(call disconnected).

43.    Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Delgado advised Ramirez that the couriers would arrive to the designated meet location in approximately 35 minutes. Additionally, Delgado told Ramirez that the couriers would be in a black Dodge Ram Dually truck.

44.    At approximately 5:59 p.m., Ramirez, on Target Telephone #1, received a call from Reyes, at Target Telephone #4. During this call, Ramirez asked who was calling. Reyes said Rayo's (Delgado's) cousin. Reyes said that Delgado told him to call Ramirez so that he could go near there. Ramirez said yes. Ramirez asked if he was just going for a title. Reyes said yes. Ramirez told Reyes to wait, and that he was

21

waiting for the guys to bring...Reyes told Ramirez to give him a call and he would be on the lookout. Ramirez said okay.

45.     Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Reyes called Ramirez at Delgado's direction in order to collect the remaining $3,000 for the two kilograms of cocaine Ramirez would be receiving. Ramirez advised that he had not received the cocaine yet. Ramirez and Reyes agreed for Ramirez to call Reyes back.

46.     At approximately 6:09 p.m., Ramirez, on Target Telephone #1, received a call from Delgado, at Mexico-based telephone number 52-614-539-1314. During this call, Delgado said they would be there in 15 minutes. Delgado told Ramirez that he sent him the number. Delgado asked Ramirez to call them. Ramirez told Delgado not to send him his number. Delgado said that he sent Ramirez their number, the number for them. Ramirez said okay. Ramirez told Delgado that he saw it, and would call from the other. Delgado said that he sent the number to this phone, through message. Ramirez said yes, he saw it now. Ramirez said he would call soon. Delgado said okay.

47.     Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Delgado advised Ramirez that the couriers would arrive to the designated meet location in approximately 15 minutes. Delgado then told Ramirez that he (Delgado) had sent him (Ramirez) the courier's

telephone number. Ramirez stated he would call the couriers from a different telephone.

48.     At approximately 6:24 p.m., investigators observed Sarmiento exit Ramirez's garage carrying a box. Investigators observed Sarmiento place the box in the back seat, on the driver's side, of his maroon Chevrolet Suburban. Sarmiento proceeded to enter into the driver's seat of his vehicle and depart from Ramirez's residence.

49.     At approximately 6:33 p.m., investigators observed Sarmiento arrive to Pancho Anaya, located 212 South Garnett Road, Tulsa, Oklahoma. Upon arrival, investigators observed Sarmiento park his maroon Chevrolet Suburban next to a black Dodge Dually that was backed into a parking spot on the east side of the building. At this time, investigators observed a Hispanic male (later identified as Julio Cesar Olivas, Jr.) wearing a lime green shirt, exit the driver's seat of the black Dodge Dually carrying a black bag. Olivas walked to the passenger side of his truck and met with Sarmiento. At approximately 6:35 p.m., investigators observed Olivas enter back into the driver's seat of his truck. At that time, investigators observed Sarmiento to depart from the parking lot in his maroon Chevrolet Suburban. Investigators observed Sarmiento to return to Ramirez's residence upon his departure from Pancho Anaya.

50.     At approximately 6:36 p.m., Ramirez, on Target Telephone #1, received a call from Delgado, at Mexico-based telephone number 52-614-539-1314. During this

call, Ramirez told Delgado that the guy (Sarmiento) was there with them. Delgado said okay. Delgado told Ramirez that they should set a deal up for the future for when Ramirez would need some so that they would have time and not have to mess with the going around. Ramirez told Delgado that he had told Delgado two weeks ago. Ramirez told Delgado that he would let Delgado know when he had a half. Delgado said yes. Ramirez told Delgado that he would give Delgado a holler later. Ramirez said that if everything went well, he would call Delgado's cousin. Ramirez told Delgado that his cousin called. Delgado said that there was one there in the "T" also. Ramirez said he would see how they came out first. Ramirez said that a guy was going to get a half. Ramirez told Delgado that he would see how he was doing, and that he hopefully got the other one sometime soon. Delgado said perfect. Ramirez said bet.

51.     Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Ramirez advised Delgado that Sarmiento was currently meeting with the couriers. Delgado and Ramirez then discussed future cocaine transactions. Additionally, Ramirez advised Delgado that Reyes had called him (Ramirez).

52.     At approximately 6:50 p.m., Ramirez, on Target Telephone #1 called Delgado, at Mexico-based telephone number 52-614-539-1314. During this call, Ramirez said they arrived and they were cool; however, each weighed 965 and 966. Delgado said oh shit. Ramirez said yes, one weighed 965 and the other 966. Delgado

24

said that he would check that out. Ramirez said one was missing 35 and the other one was missing 34, but they were bad ass. Delgado told Ramirez that he was talking to the guy. Delgado said that the guy was one of the first ones that Delgado started with. Delgado asked Ramirez if he remembered. Ramirez said yes. Delgado said that the guy had up to four. Delgado said that Ramirez could get four weekly or bi-weekly from them. Delgado said that they could send four, he just had to pay three, and one would be loaned. Ramirez said okay, but he needed to see how things went for him. Ramirez said it was good for the nose. Ramirez said that he had to check because his buddy used it for...Ramirez said that was what the black people did. Ramirez said that the problem right now was the weight. Ramirez said one was off by 35, and the other was off by 34. Ramirez said it was 69. Ramirez said that was almost two and a half. Delgado said he would let him know. Ramirez said that the guy was there right now, and he had to get right with him now. Ramirez said that he would want to take some from that. Delgado said that he would talk to the guy. Ramirez said okay.

53.     Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Ramirez called Delgado to advise him that he had received two kilograms of cocaine; however, each kilogram was short on weight. Ramirez explained to Delgado that one kilogram of cocaine he had received weighed 965 grams and the other kilogram weighed 966 grams, which left him short 69 grams of cocaine. Ramirez explained that the quality of the cocaine

25

was good ("bad ass"), but he was short weight. Delgado advised he would contact "the guy" to find a solution.

54.     At approximately 7:03 p.m., Ramirez, on Target Telephone #1, called Reyes at Target Telephone #4. During this call, Ramirez told Reyes to come over. Reyes sai,d okay. Ramirez asked Reyes if he remembered the house. Reyes said yes.

55.     Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Ramirez called Reyes to advise him to travel to Ramirez's residence in order for Reyes to pick up the remaining $3,000 on behalf of Delgado.

56.     At approximately 7:15 p.m., Ramirez, on Target Telephone #1, received a call from Reyes, at Target Telephone #4. During this call, Reyes told Ramirez that he was outside. Ramirez told Reyes to pull forward a bit more, in front of the Suburban he would see him. Reyes said, okay.

57.     Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Reyes called Ramirez to advise him that he (Reyes) had arrived to Ramirez's residence.

58.     At approximately 7:16 p.m., investigators observed a black Kia Optima arrive to Ramirez' residence. Investigators observed Ramirez give the driver of the black Kia Optima an unknown object. Moments later, the black Kia Optima departed

from Ramirez's residence. It should be noted, during this investigation, investigators have identified Reyes to drive a black Kia Optima bearing Oklahoma tag LFN855.

59.     At approximately 7:16 p.m., Ramirez, on Target Telephone #1, called Delgado, at Mexico-based telephone number 52-614-539-1314. During this call, Ramirez told Delgado that his cousin had been served. Delgado said okay, perfect.

60.     Based on my training and experience and my knowledge of this investigation, during the call described above, I believe Ramirez called Delgado to advise him that he (Ramirez) had provided Reyes (Delgado's cousin) with the remaining $3,000 for the two kilograms of cocaine that Ramirez and Sarmiento had received.

61.     On October 28, 2022, at approximately 3:41 p.m., Reyes, on Target Telephone #5, called Bogart Mendoza at telephone number 918-982-8981. During the call, Mendoza asked Reyes what time he was going to meet that lady. Reyes asked Mendoza what lady. Mendoza said the one with the cigarettes. Reyes said the lady around 5:00. Mendoza asked if at the dispensary. Reyes said the lady did because (unintelligible) too. Reyes said okay. Reyes asked how much, just one. Mendoza said the guy did not say how much he was going to give Mendoza but the son of a bitch had 9 pounds. Reyes acknowledged.

62.     At approximately 6:04 p.m., investigators observed GPS location data on Reyes's black Kia Optima, (granted by Special Judge Tanya Wilson, 14th Judicial

District of Oklahoma, on September 12, 2022) depart from Reyes's residence, **10869 East 33rd Place, Tulsa, Oklahoma**.

63.     At approximately 6:17 p.m., investigators observed GPS location data on Reyes's black Kia Optima to indicate the vehicle had arrived to Natural Root Dispensary, located at 9223 South Garnett Road, Broken Arrow, Oklahoma. Approximately five minutes later, investigators established physical surveillance at Natural Root Dispensary and observed the black Kia Optima parked in the parking lot. Additionally, investigators observed Reyes inside the business talking with an unknown female.

64.     At approximately 6:33 p.m., investigators observed Reyes exit the business, enter the black Kia Optima, and depart from the parking lot.

65.     At approximately 6:33 p.m., Reyes, on Target Telephone #5 called Mendoza at telephone number 918-982-8981. During this call, Reyes told Mendoza that she only gave him 500. Mendoza said only 500. Reyes said yup. Mendoza said no way and to him (Reyes). Reyes said 500 of the other as well. Mendoza asked if Reyes told her anything. Reyes said yes, he told her but she said those guys left them bankrupt. Mendoza asked if she had the stuff there and told Reyes to tell her to give Reyes the number of the guy. Mendoza said (unintelligible). Reyes said that she had the two or three pounds there, something like that. Mendoza said it was three. Reyes said yup. Reyes said that she was sending whatever she was selling. Mendoza said that

it was not that hard to sell one of those, man. Reyes said it was bullshit. Mendoza said he was there and call when Reyes was outside. Reyes said okay. Mendoza said alright.

66.     Based on my training and experience and my knowledge of this investigation, during this call, I believe Reyes told Mendoza that the unknown female only paid him $500.00 for a quantity of narcotics belonging to Reyes and Mendoza that she was selling out of the dispensary. Reyes told Mendoza that she had two to three pounds. Mendoza confirmed that she had three pounds. Reyes and Mendoza expressed their frustrations with the female because she wasn't selling their product (marijuana) quick enough. Mendoza told Reyes to call him when he arrived.

67.     At approximately 6:49 p.m., investigators observed GPS location data on Reyes's vehicle arrive to Worthington Apartments, located at 11905 East 21st Court, Tulsa, Oklahoma. At this same time, Reyes, on Target Telephone #5 called Mendoza at telephone number 918-982-8981. During this call, Reyes said he was outside. Mendoza said he was coming.

68.     Based on my training and experience and my knowledge of this investigation, I believe Reyes delivered $500.00 of marijuana proceeds to Mendoza.

69.     At approximately 6:53 p.m., investigators established surveillance at the Worthington Apartments and observed Reyes departing from the area. At approximately 6:59 p.m., investigators observed GPS location data on Reyes's vehicle to indicate he had returned to his residence, located at 10869 East 33rd Place.

70.     On November 7, 2022, at approximately 12:12 p.m. Reyes, on Target Telephone #5, called 918-706-6665, herein referred to as UM6665. During this call Reyes said he was on the other line and asked UM6665 what was the word. UM6665 said he was on his lunch break and was about to head back to work. UM6665 asked if homie had new. Reyes said he had not checked and needed to go see if he was done. Reyes said he was going to see him tonight. UM6665 said he wanted to know if it was new or not because he still had seven left. UM6665 said he would call Reyes later. Reyes asked what time would UM6665 get off. UM6665 said 5:30. Reyes told UM6665 to call him. UM6665 said alright.

71.     Based on my training and experience, and knowledge of this investigation, investigators believe that Reyes was calling UM6665 in an attempt to see if he (UM6665) had money owed to Reyes for a drug debt. UM6665 told Reyes he had the money and enough for an additional quantity of narcotics. UM6665 asked Reyes if the third party had any new narcotics or if it was the same because UM6665 still had a quantity of narcotics (7).

72.     On November 8, 2022, at approximately 3:27 p.m. UM6665 called Reyes on Target Telephone #5 at approximately 3:27 p.m. During this call UM6665 said that he was about to get off work in about 10 more (unintelligible). Reyes said alright and that he would see him there. UM6665 said alright.

30

73.     Based on my training and experience, and knowledge of this investigation, investigators believe UM6665 was calling Reyes to coordinate a time to deliver a payment owed to Reyes for narcotics purchased from Reyes.

74.     At approximately 3:31 p.m., Reyes, using Target Telephone #5, called UM6665 and asked him (UM6665) if he said 10 minutes. UM6665 said yes and that he was about to leave in about five or 10 minutes because he was cleaning up. Reyes asked if UM6665 asked him (Reyes) to meet him there. UM6665 said "QT Garnett." Reyes asked if UM665 did not want to meet him at the job site. UM6665 said no because it was not for him but a "fucking whore." Reyes laughed and said that he was waiting at QuikTrip. UM6665 said alright.

75.     Based on my training and experience, and knowledge of this investigation, investigators believe Reyes was confirming the meet location with UM6665, who told Reyes he didn't want to meet at his job site because a third party might be watching (fucking whore).

76.     At approximately 3:32 p.m. Reyes, on Target Telephone #5, called 918-972-8337, herein referred to as UM8337. During this call Reyes asked UM8337 if UM8337 could pick up the tickets from the white guy (UM6665). UM8337 asked if right now. Reyes said yes and asked where he was at. UM8337 said on 31st and 129 and asked where it would be. Reyes said on 41st and Garnett. UM8337 asked where he was going to see him (UM6665). Reyes said that he would pick up the tickets and

then send him (UM6665) over to UM8337. Reyes said that he would meet him so that UM8337 could take the other one to him (UM6665). UM8337 said alright and would go in the meantime because it was closer. Reyes said alright.

77.     Based on my training and experience and knowledge of this investigation, investigators believe that Reyes called UM8837 to ask if UM8337 could meet with UM6665 (the white guy) to collect money (tickets). Reyes told UM8337 that he would collect the money from UM6665 and then send UM6665 to UM8337 to pick up more narcotics (the other).

78.     Investigators observed the GPS location data on Reyes's Kia Optima to leave his residence, **10869 East 33rd Place Tulsa, Oklahoma**, at approximately 3:29 p.m. and drive directly to the QuickTrip at 4030 S Garnett Road, Tulsa, Oklahoma, arriving at approximately 3:33 p.m.

79.     At approximately 3:40 p.m. investigators established physical surveillance at QuikTrip and observed Reyes's black Kia Optima parked at pump #15. At approximately 3:48 p.m. investigators observed an unknown white male exit the front passenger seat of Reyes's black Kia Optima and get into the driver seat of a black 2015 BMW 320i. Investigators observed both vehicles leave the parking lot of QuikTrip and travel westbound on 41st St. Shortly after, the BMW conducted a U-Turn and traveled back eastbound on 41st St. Investigators lost visual of the BMW and continued physical surveillance on Reyes's black Kia.

80.　Based off of my training and experience, and knowledge of this investigation, investigators believe that UM6665 provided Reyes with payment for illegal narcotics purchased from Reyes. Investigators know it is common for individuals involved in the trafficking of narcotics to meet in parking lots and gas stations with heavy traffic in attempts to blend in with normal business to avoid detection by law enforcement.

81.　At approximately 4:00 p.m. investigators observed GPS location data to be showing in the area of 832 North Louisville Avenue, Tulsa, Oklahoma. Investigators conducted physical surveillance and observed the Reyes Black Kia Optima to be parked in front of 840 N Louisville Avenue, Tulsa, Oklahoma.

82.　Based on my training and experience, and knowledge of this investigation, investigators believe Reyes traveled to 840 N Louisville Avenue, Tulsa, Oklahoma to deliver money proceeds paid to him by UM6665 and possibly pick-up additional narcotics. Investigators know that individuals involved in the trafficking of illegal narcotics keep drug proceeds, and illegal narcotics in separate locations, in efforts to thwart law enforcement efforts of seizing drug proceeds or illegal narcotics.

83.　At approximately 4:19 p.m. investigators observed Reyes exit 840 North Louisville Avenue and enter the driver seat of his black Kia Optima. Investigators conducted physical surveillance and monitored GPS location data on the black Kia Optima, ultimately following it back to Reyes's residence at 10869 East 33rd Place.

33

84.     Based on my training and experience, and knowledge of this investigation, investigators believe that Reyes picked-up illegal narcotics from 840 N Louisville Avenue and then drove straight to his residence. Investigators know it is common for individuals trafficking illegal drugs to drive straight to their residence or a stash location, after conducting a drug transaction or picking up more narcotics to eliminate any risk of being stopped by law enforcement or robbed with large sums of cash, and or quantities of narcotics.

## Conclusion

85.     Based on the information above regarding physical surveillance of Reyes collecting drug proceeds, and the interception of communications discussing illegal narcotics and the distribution of illegal narcotics, I submit that there is probable cause to search **10869 East 33rd Place, Tulsa, Oklahoma**, Tulsa County, Northern District of Oklahoma, including outbuildings and vehicles on the curtilage premises as further described in Attachment A, and seize the items described in Attachment B.

86.    I request to be allowed to share this affidavit and the information obtained from this search with any government agency, to include state and local agencies investigating or aiding in the investigation of this case or related matters, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions from this matter.

Respectfully Submitted,

SA Nicholas Sanders
Drug Enforcement Administration

Sworn to before me via telephone this 14th  day of November, 2022.

CHRISTINE D. LITTLE
United States Magistrate Judge

35

## ATTACHMENT "A"

## LOCATION TO BE SEARCHED

**10869 East 33ʳᵈ Place, Tulsa, Oklahoma and curtilage premises;** The residence to be searched is a family residential dwelling located at **10869 East 33ʳᵈ Place, Tulsa, Oklahoma**. The residence is situated on the north side of **East 33rd Place**, facing south, and is the seventh dwelling west of South 112th East Avenue. The residence is constructed of a combination of brown colored brick and maroon colored siding. The trim around the roof is maroon in color. The front door of the residence is covered by a black rod iron storm door. The numbers "10869" (yellow/gold in color) are affixed to the overhang leading to the front door. The residence to be searched is more commonly known as **10869 East 33ʳᵈ Place, Tulsa, Oklahoma**. The residence to be searched is located within the Northern District of Oklahoma.



## ATTACHMENT "B"

## DESCRIPTION OF ITEMS TO BE SEIZED

1.      Documents showing ownership of real or personal property;

2.      United States Currency or items reflecting drug proceeds;

3.      Books, records, receipts, notes and other papers relating to the trafficking of narcotics even though these documents may be in code or in a different language other than English or in electronically stored data.

4.      Contraband, including controlled substances, proceeds of drug sales, records of drug transactions, drug sources, drug customers, and other tangible items evidencing the obtaining, secreting, transfer and/or concealment of assets and/or money obtained through or used in the transportation, distribution, and sale of narcotics, including but not limited to drug or money ledgers, buyers lists, seller lists, recording of sales and any corresponding records of account receivable, money paid or received, drugs supplied or received, cash received to be paid for controlled substances or intended to be paid for controlled substances, whether in paper form or electronically stored data on computer discs, cellular telephones, or other storage media;

5.      Items of personal property tending to establish the existence of a narcotics conspiracy including but not limited to personal telephone bills, photographs and documents and other items reflecting names, addresses, telephone numbers, and communications;

6.    Paraphernalia for distributing, packaging and weighing narcotics. Equipment and materials used in the building or using concealed compartments;

7.    Articles of personal property tending to establish the ownership of the property in question, including telephone, rent receipts, keys, utility company receipts, papers, documents, letters and cancelled mail envelopes;

8.    Records of mail and communication services for cellular telephones and other communication devices which evidence the participation in a conspiracy to distribute narcotics;

9.    Records and items reflecting travel for the purpose of participation in drug trafficking including passports, airline tickets, vehicle rental receipts, credit card receipts, hotel and restaurant receipts, cancelled checks, maps and records of long distance calls reflecting domestic and foreign travel;

10.   Any and all appointment calendars;

11.   Bank statements, loan applications, money drafts, letters of credit, money orders, cashier's checks, bank checks, safety deposit box keys, vault keys, safes, any and all documents relating to banking activities and other financial transactions including the purchase of real estate and documents showing ownership of real estate;

12.   Records relating to employment, wages earned and paid and other

compensation records. Records relating to local, state and federal personal and business income, sales and service taxes, including but not limited to, computations, notes and records used for tax purposes;

13.     Evidence of proceeds including items relating to maintaining, secreting, gathering or liquidating drug proceeds, particularly:   financial records of withdrawals, funds of transfers, purchases, sales, transfers of assets or consolidation of assets. Liquid assets or evidence of them including currency, bank statements, money drafts, letters of credit, money orders, cashier's checks, pass books, precious metals and jewelry, and documents relating to safe deposit boxes, stocks, bonds and other financial instruments;

14.     Evidence of the expenditure of money for the purchase of vehicles or evidence establishing an ownership interest in vehicles, including certificates of title, vehicle tag records, photographs and receipts of vehicle transactions;

15.     Evidence of Conspiracy to Distribute and Conspiracy to Possess with Intent to Distribute Cocaine contained within vehicles on the curtilage of the property to be searched;

16.     Cellular telephones or other electronic storage devices such as PDA's or electronic organizers (for which a separate warrant will be requested if seized);

17.     Electronic memory chips or storage chips or SIM cards used in cellular telephones and the data and information stored thereon. Computers and data

3

storage devices including discs, drives, CD's and DVD's and the electronically stored data thereon. The electronically kept information or data stored on electronic storage devices, computers or PDA's whether in files or disc, drives, in memory storage devices, in the drives or other electronic storage medium. E-mail, text messages or other notes or records whether financial or otherwise, accessible by computer or other communication services stored in files on hard drives, drives, CD, DVD, in the drives, or other electronic storage medium or device (for which a separate warrant will be requested if seized);

19.    Firearms, ammunition and articles associated with the possession, ownership and use of firearms including, boxes, receipts, holsters, clips, and equipment.

4